**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

)
**SANDRA COMPTON,** *et al.*, )
)
       **Plaintiffs,** )
)
       **v.** )     **Civil Action No. 13-262 (RMC)**
)
**ALPHA KAPPA ALPHA SORORITY,** )
**INC.,** *et al.*, )
)
       **Defendants.** )
———————————————————————)

## OPINION

Two members of Alpha Kappa Alpha Sorority, Inc., and their daughters sue the Sorority, alleging that it wrongfully denied the daughters entry into the Sorority's Alpha Chapter at Howard University. Howard University is also a named defendant. Both Defendants have filed motions to dismiss, arguing that none of the Plaintiffs has advanced claims that exceed the amount in controversy required for federal suits between citizens of different states. The Sorority also argues that it did not breach any contractual obligation to Plaintiffs and that all other claims are without merit. Howard contends that it cannot be held liable for the Sorority's actions. For the reasons set forth below, the Court will grant Howard's motion to dismiss and will grant the Sorority's motion in part.

## I. FACTS

Sandra Compton and Lessie Cofield (collectively, Mothers) are longstanding, active, and proud members of Alpha Kappa Alpha Sorority, Inc., (AKA) the first Greek-lettered

sorority established and incorporated by African American college women.[1] AKA was founded in 1908 at Howard University in Washington, D.C., to "cultivate and encourage high scholastic and ethical standards, improve the social stature of the race, promote unity and friendship among college women, and keep alive within graduates an interest in college life and progressive movement emanating therefrom." *See* Opp'n [Dkt. 32], Ex. 1 (AKA Constitution & Bylaws) [Dkt. 32-3] Preamble. Because AKA was founded at Howard University, the Sorority's Howard Chapter is known as the "Alpha Chapter." Both Sandra Compton and Lessie Cofield have dreamed for years that their daughters, Laurin Compton and Lauren Cofield, would join AKA's Alpha Chapter. In fact, Lauren Cofield chose Howard University over her first choice, Hampton University, for that very reason. But after a series of unanticipated events from 2009 to 2013, the daughters were not able to realize their dream of becoming Sorors.

### A. Efforts to Join AKA

Laurin Compton and Lauren Cofield (collectively, Daughters) entered Howard University as freshmen in the fall of 2009. The Daughters were deemed AKA Legacy Candidates, *i.e.*, "the daughters, granddaughters, adopted daughters or legal wards of an active or deceased [S]oror." AKA Constitution & Bylaws, Art. IV, § 14. Generally, Legacy Candidates receive preferential treatment over non-Legacy Candidates in the Sorority selection process. For instance, AKA's Constitution and Bylaws provide that "[a]ny undergraduate who applies for membership under the legacy provision must meet all of the qualifications required for undergraduate membership. *She will not be subject to a vote by the chapter*." *Id.* (emphasis added). Moreover, with respect to selection priority, AKA's national guidelines provide that:

---

[1] The facts are taken from Plaintiffs' Second Amended Complaint, Dkt. 29, and the record evidence preceding the motions to dismiss, including two hearings in open Court with witness testimony.

> If a college or university has a cap requirement (the number of participants [is] limited), the chapter shall use the following selection criteria:
>
> • Select candidates in the following priority order:
>
>   a. Legacies
>   b. Sophomores
>   c. Juniors
>   d. Seniors
>
> If the numbers are still outside the requirements, GPA could be used as an additional criterion for ranking and selecting candidates.

AKA Mot. to Dismiss [Dkt. 30], Ex. 1 (AKA Undergraduate Membership Intake Process Manual) [Dkt. 30-2] at I-15.

Yet the Sorority also has an interest in maintaining its on-campus presence. Accordingly, AKA balances its preferences for Legacy Candidates and other candidates who can continue AKA traditions throughout their time on a college campus. These dual motivations are best reflected in the Sorority's Legacy Cap provision:

> If a college or university has a Legacy cap requirement (the number of Legacy Candidates [is] limited), the chapter shall use the following selection criteria:
>
> • Select Legacy candidates in the following priority order:
>
>   a. Sophomores
>   b. Juniors
>   c. Seniors
>
> If the numbers are still outside the requirements, GPA could be used as an additional criterion for ranking and selecting candidates.

*Id.*

In April or May of 2010, during their freshman year, the Daughters were among a select group of freshmen invited by undergraduate members of the Alpha Chapter to attend AKA's "Ivy Day." While Ivy Day was primarily intended to honor graduating Sorors, AKA

included as part of the event a "base level recruitment mixer . . . to influence other undergraduate women to join AKA."  2d Am. Compl. ¶ 17.

After Ivy Day, however, the recruitment process took an unexpected turn.  In 2010, AKA started an unofficial process that involved hazing candidates who wanted to participate in the Membership Intake Process during their sophomore years.  *Id.* ¶ 20.  Certain aspects of that process were relatively harmless: candidates were directed to avoid wearing pink and green, the official AKA colors, as well as colors that could be blended to make pink or green.  *Id.*  But other aspects of the process were more injurious.  For instance, candidates were "commanded to contact random [S]orors daily at a certain hour on the minute, and if they failed to do so, the [candidates] would be forced to suffer and endure verbal abuse . . . ."  *Id.* ¶ 21.  The Daughters also recount instances in which candidates were "heckled, harangued, and humiliated . . . in front of their peers," "mentally tormented by [S]orors," and "restricted from speaking with friends . . . and warned not to report abuses."  *Id.*  If a candidate failed to comply with a command, she was disqualified from the Membership Intake Process.

Despite their eagerness to join AKA's Alpha Chapter, Lauren Cofield and Laurin Compton did not participate in the unofficial hazing process in the spring of 2010.  Instead, Lauren Cofield reported the hazing to her mother, Lessie Cofield, after Sorority members instructed that she disassociate from her close friends on campus.  Lessie Cofield contacted Howard's undergraduate advisor in the summer of 2010, and her concerns were "amicably put to rest."  *Id.* ¶ 25.  Nonetheless, Sorors in AKA's Alpha Chapter learned of Lessie Cofield's phone call.

When Lauren Cofield and Laurin Compton returned to Howard for their sophomore year, they were ostracized by AKA Sorors during official recruiting events and

Lauren Cofield was labeled a "snitch." *Id.* ¶ 27. The clandestine hazing continued, but the Daughters continued to avoid any involvement in that process. In the spring of 2011, the Daughters learned that the Alpha Chapter was under investigation for its hazing practices, and thereafter, AKA was suspended from recruiting new members for two years. Consequently, the Daughters could not participate in the official Membership Intake Process during their sophomore and junior years of college.

On or about January 26, 2013, AKA notified Howard students that it would be holding a Rush process, *i.e.*, an unofficial meeting for candidates to express interest in the Sorority. Lauren Cofield and Laurin Compton timely completed the general application and the Legacy Candidate application on that day. *Id.* ¶ 31. In all, AKA received 385 applications from candidates for the Membership Intake Process.[2] Twenty-eight of the considered applicants were Legacy Candidates, and seventeen of those Legacy Candidates were sophomores and juniors. The remaining thirty-three considered applicants were non-Legacy Candidates. *Id.* ¶¶ 32–33.

AKA's Membership Intake Process was governed, in part, by rules adopted by Howard University and the National Pan Hellenic Council (NPHC) at Howard. *See* AKA Constitution & Bylaws, Art. IV, § 22 ("The Membership Intake Process shall be conducted according to the process adopted by the Directorate except on college campuses where university or Panhellenic Conference regulations dictate other procedures."). Howard placed a cap of sixty-five new members on all Greek-lettered organizations. *See* Opp'n, Ex. 2 (Howard University Student Handbook) [Dkt. 32-4] at 63. However, NPHC's Howard Chapter, of which AKA is a member, imposed a "membership intake limit of no more than fifty (50) selected applicants." Opp'n, Ex. 4 (NPHC Howard Chapter Constitution) [Dkt. 32-6] at 15. NPHC further mandated

---

[2] AKA immediately rejected 324 candidates for unspecified reasons. AKA gave detailed consideration to sixty-one candidates for the Membership Intake Process.

that, "[f]or organizations that observe a Legacy Clause[,] no more than 1/3 of selected applicants per intake period shall be legacy applicants." *Id.*

Plaintiffs note that AKA is the only Greek-lettered organization on Howard's campus with a Legacy Clause in its Constitution and Bylaws. Plaintiffs contend that NPHC's limitations were not binding on AKA because the Sorority published its own Membership Intake Process Manual that instructs local Chapters with respect to recruiting caps. *See* AKA Undergraduate Membership Intake Process Manual at I-15. It is undisputed, however, that AKA's Alpha Chapter adhered to NPHC's more restrictive caps during the selection of its 2013 membership intake class.

Plaintiffs allege that "all of the women who elected to participate in the unofficial clandestine 'hazing' process were selected for the [Membership Intake Process] at the expense of . . . [the Daughters], who followed the Rules, and were thus entitled to participate in the process due to their Legacy status." 2d Am. Compl. ¶ 34. Plaintiffs further aver that Lauren Cofield and Laurin Compton met all of the necessary qualifications for membership but, in contravention of AKA's Bylaws, the Daughters were subjected to a vote by the Alpha Chapter. *Id.* ¶ 36; *see also* AKA Constitution & Bylaws, Art. IV, § 14.

On January 30, 2013, Lessie Cofield contacted Constance Pizzaro, AKA's North Atlantic Regional Director, to complain about AKA's selection of candidates for its Membership Intake Process. Ms. Pizzaro explained that "if there are more candidates than slots, she uses the highest GPA of the students downward" until all spaces are filled. 2d Am. Compl. ¶ 45. Ms. Pizzaro also promised that "if Howard University lift[ed] their cap [she would] apply the additional slots to the senior legacy candidates because they [were] the only group not taken care of." *Id.*

When Lessie Cofield and Sandra Compton discovered that their daughters had not been selected for membership intake, they telephoned and sent letters to Howard's Student Activities Director. *Id.* ¶ 48. Lessie Cofield and Sandra Compton had been "very active dues paying members of AKA for over two decades," and the Mothers therefore felt that "their individual rights were affected by the AKA's failure to follow the dictates of its Constitution and Bylaws" with respect to their daughters. *Id.* ¶ 49.

## B. Procedural History

On February 28, 2013, Sandra Compton, Laurin Compton, Lessie Cofield, and Lauren Cofield filed suit against AKA and Howard University, alleging that the Daughters were wrongfully denied entry into AKA's Alpha Chapter at Howard University. Specifically, Plaintiffs alleged violations of the D.C. Human Rights Act, D.C. Code § 2-1402.41, negligence, breach of contract, and ultra vires acts[3] against AKA and Howard.

On the same day, Plaintiffs moved for a temporary restraining order against Defendants and moved for a preliminary injunction on March 1, 2013, to require AKA to admit the Daughters into the Membership Intake Process. They argued that because the Membership Intake Process is held once a year and because the Daughters were seniors seeking admission into an undergraduate-only Chapter, all Plaintiffs would suffer irreparable harm if the Daughters were not permitted to join the process in 2013. After a hearing, the Court denied Plaintiffs' motion for a temporary restraining order and reserved decision on the motion for a preliminary injunction.

Immediately prior to the preliminary injunction hearing, Plaintiffs' counsel alleged that AKA had sought to tamper with and intimidate Sandra Compton and Lessie Cofield,

---

[3] The term "ultra vires" refers to an act that is "beyond the scope of power allowed or granted by a corporate charter or by law." Black's Law Dictionary 1558 (8th ed. 2004).

potential witnesses, by withdrawing their AKA membership privileges in retaliation for their

filing this lawsuit. The Court denied Plaintiffs' request for preliminary injunctive relief, but

directed briefing on the alleged witness tampering. Sandra Compton alleged that AKA's

withdrawal of her membership privileges "caused her to 'decide not to travel to D.C. from

Atlanta for the second round of hearings on March 7th because she felt that her physical presence

might lead to her expulsion from AKA.'" *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 938 F.

Supp. 2d 103, 106–07 (D.D.C. 2013) (internal alterations omitted) (quoting Compton Aff.

[Dkt. 14-1] ¶ 5). Further, Lessie Cofield asserted that other AKA members became distant

because "they feared the same reprisal." Cofield Aff. [Dkt. 14-1] ¶ 14. While the Court found

AKA's conduct to be wrongful, it decided that no sanction was appropriate because "the effects

of AKA's conduct would not have altered [the] decision to deny [preliminary injunctive] relief."

*Compton*, 938 F. Supp. 2d at 107. Accordingly, the Court denied Plaintiffs' oral motion for

sanctions without prejudice. *Id.* at 108.

On April 22, 2013, Plaintiffs filed a motion for leave to file an Amended

Complaint. The Court held that motion in abeyance to determine whether this matter could be

settled or streamlined before further litigation. Shortly thereafter, the Court directed Plaintiffs to

file a Second Amended Complaint and simultaneously referred this matter for mediation. The

parties engaged in settlement discussions for over five months, but ultimately failed to reach

agreement.

Plaintiffs filed their Second Amended Complaint on October 25, 2013. As

against AKA, the Second Amended Complaint alleges four Counts of breach of contract on

behalf of each Plaintiff, as well as two Counts of ultra vires acts, two Counts of negligence, and

two Counts of intentional infliction of emotional distress on behalf of Sandra Compton and

Lessie Cofield.  As against Howard, the Second Amended Complaint alleges four Counts of tortious interference with contractual relations on behalf of each Plaintiff.[4]

On November 18, 2013, AKA and Howard moved separately to dismiss the Second Amended Complaint for lack of jurisdiction and failure to state a claim.  AKA and Howard contend that Plaintiffs cannot meet the amount in controversy required to establish subject matter jurisdiction; in the alternative, AKA and Howard argue that Plaintiffs fail to state a claim for the legal theories asserted in the Second Amended Complaint.  The motions to dismiss were fully briefed as of January 3, 2014.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss under Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory requirement and an Article III requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr*

---

[4] Specifically, Plaintiffs' Second Amended Complaint includes the following Counts: Count One, Lauren Cofield's breach of contract claim against AKA; Count Two, Lessie Cofield's breach of contract claim against AKA; Count Three, Lessie Cofield's ultra vires act claim against AKA; Count Four, Laurin Compton's breach of contract claim against AKA; Count Five, Sandra Compton's breach of contract claim against AKA; Count Six, Sandra Compton's ultra vires act claim against AKA; Count Seven, Sandra Compton's negligence claim against AKA; Count Eight, Lessie Cofield's negligence claim against AKA; Count Nine, Lauren Cofield's claim of tortious interference with contractual relations against Howard University; Count Ten, Laurin Compton's claim of tortious interference with contractual relations against Howard University; Count Eleven, Lessie Cofield's claim of tortious interference with contractual relations against Howard University; Count Twelve, Sandra Compton's claim of tortious interference with contractual relations against Howard University; Count Thirteen, Sandra Compton's claim of intentional infliction of emotional distress against AKA; and Count Fourteen, Lessie Cofield's claim of intentional infliction of emotional distress against AKA.

*v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction" (internal citations omitted)).

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court reviews the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). Nevertheless, "the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006). A court may consider materials outside the pleadings to determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, Federal Practice & Procedure, § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 19–20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). Under such circumstances, consideration of documents outside the pleadings does not convert the motion to dismiss into one for summary judgment. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

**B. Motion to Dismiss Under Rule 12(b)(6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. A complaint must be sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted). Although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds for her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. The facts alleged "must be enough to raise a right to relief above the speculative level." *Id*.

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). When a document is referenced in a complaint and is central to a plaintiff's claim, the court may consider the document without converting the motion to dismiss into one for summary judgment. *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Id*. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

# III.  ANALYSIS

AKA and Howard assert that the Second Amended Complaint must be dismissed because the amount in controversy for any individual Plaintiffs' claims cannot exceed $75,000, as required to establish diversity jurisdiction.  Defendants also contend that, even if Plaintiffs do exceed the $75,000 requirement, they have failed to state a claim for breach of contract, ultra virus acts, negligence, tortious interference with contractual relations, or intentional infliction of emotional distress.  As explained below, at least one Plaintiff can meet the amount in controversy requirement based on claims asserting pain, suffering, and emotional distress.  The Court has supplemental jurisdiction over all remaining claims because they relate to the same case or controversy.  On the pleadings, however, Plaintiffs have failed to state a claim for breach of contract, negligence, tortious interference, or intentional infliction of emotional distress.  The Mothers have stated a claim that AKA acted beyond the authority provided in its governing documents, *i.e.*, ultra vires, and the Court will not dismiss that claim.[5]

## A.  Subject Matter Jurisdiction

At the outset, the Court must address its jurisdiction to hear the matter at hand.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 (1998)).  Pursuant to 28 U.S.C. § 1332, federal district courts have jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states."  28 U.S.C. § 1332(a)(1).

---

[5] Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).  Plaintiffs have standing to sue AKA and Howard because Plaintiffs have suffered an "injury in fact," there is a causal connection between that injury and AKA and Howard's alleged conduct, and the injury could be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The Supreme Court has interpreted 28 U.S.C. § 1332 to require "complete diversity," which exists when the citizenship of each plaintiff is diverse from the citizenship of each defendant. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996) (citing *Strawbridge v. Curtiss*, 3 Cranch 267 (1806)). With respect to the amount in controversy, "[s]eparate and distinct claims, regardless of whether they share a community of interest or originate in a single transaction or event, may not be aggregated to satisfy the jurisdictional amount-in-controversy requirement." *Georgiades v. Martin-Trigona*, 729 F.2d 831, 833 (D.C. Cir. 1984). As a result, the separate and distinct claims of two or more plaintiffs cannot be combined to satisfy the jurisdictional amount. *See Breakman v. AOL LLC*, 545 F. Supp. 2d 96, 103 (D.D.C. 2008) (citing *Snyder v. Harris*, 394 U.S. 332, 335 (1969)). Federal courts must strictly construe the statute conferring diversity jurisdiction. *See Thomson v. Gaskill*, 315 U.S. 442, 446 (1942) (citing *Healy v. Ratta*, 292 U.S. 263, 270 (1934)); *see also Kokkonen*, 511 U.S. at 377.

It is undisputed that complete diversity of citizenship exists here. However, the parties vigorously contest whether any Plaintiff can satisfy the amount in controversy requirement. The Court addresses this requirement in detail below.

## 1. Amount in Controversy

Each Plaintiff contends that the amount in controversy for her individual claims exceeds $75,000 based on medical bills, emotional harm, mental anguish, loss of prospective economic advantages, and punitive damages. These assertions are based, in part, on events that occurred after the filing of this lawsuit. It is well-established that "'the jurisdiction of the court depends upon the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)). "'[L]ater events may not create jurisdiction where none existed at the time of filing.'"

*Landmark Health Solutions, LLC v. Not for Profit Hosp. Corp.*, 950 F. Supp. 2d 130, 135

(D.D.C. 2013) (quoting *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir.

2008)). The Supreme Court has adhered to this time-of-filing rule "regardless of the cost it

imposes." *Grupo Dataflux*, 541 U.S. at 571. Here, the Mothers allege ultra vires acts (Counts

Three and Six) and intentional infliction of emotional distress (Counts Thirteen and Fourteen)

based on AKA's withdrawal of their membership privileges. Because these allegations

materialized after Plaintiffs filed their initial Complaint, the Court will not consider Counts

Three, Six, Thirteen or Fourteen for purposes of calculating the amount in controversy.[6] The

Court will consider only those Counts alleging breach of contract, tortious interference with

contractual relations, and negligence.[7]

   AKA and Howard claim that "Plaintiffs have not put forth any supported facts or

evidence to meet their burden to establish jurisdiction." AKA Mot. to Dismiss at 3. Specifically,

Defendants find it dubious that any Plaintiff could recover more than $75,000 for the alleged

harm in this case. When a defendant contests diversity jurisdiction based on the amount in

controversy, a federal court can dismiss the action only when it appears to a legal certainty that a

plaintiff either cannot recover the amount claimed or was never entitled to recover damages.

---

[6] Nor can the Court consider these allegations to calculate the amount in controversy under 28 U.S.C. § 1653, which allows parties to amend pleadings to cure "[d]efective allegations of jurisdiction." The Supreme Court has interpreted 28 U.S.C. § 1653 as addressing "only incorrect statements about jurisdiction that actually exists, and not defects in the jurisdictional facts themselves." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831 (1989). Therefore, the Court cannot consider events post-dating the initial Complaint to calculate the amount in controversy, as this would supplement rather than clarify jurisdictional facts.

[7] The Mothers' negligence claims relate to pre-filing activity, *i.e.*, AKA's rejection of the Daughters from the 2013 Membership Intake Process, and post-filing activity, *i.e.*, the Sorority's withdrawal of the Mothers' membership privileges after the filing of this lawsuit. However, the Mothers include one generalized allegation of "mental anguish, emotional distress, embarrassment, [and] humiliation." 2d Am. Compl. ¶¶ 103, 108. The Court construes the Mothers' alleged damages as applying to both the pre-filing and post-filing activity.

*Rosenboro v. Kim*, 994 F.2d 13, 16–17 (D.C. Cir. 1993) (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938)). The D.C. Circuit has interpreted this standard to demand that "courts be very confident that a party cannot recover the jurisdictional amount before dismissing the case for want of jurisdiction." *Id.* at 17.

Plaintiffs include generalized allegations concerning compensatory damages for breach of contract, as well as non-economic and punitive damages. Plaintiffs' allegations concerning the amount in controversy provide, in full:

> [T]he amount in controversy exceeds $75,000.00 exclusive of interest and costs (Each Plaintiff identified in the instant complaint has suffered medical bills, mental anguish, emotional distress, embarrassment, humiliation, loss of society, loss of economic advantages and potential financial opportunities, public scorn & ridicule, defamation, loss of expenses associated with and arising out of obtaining or maintaining membership in Alpha Kappa Alpha Sorority, Incorporated, and irreparable harm as further explained herein; each Plaintiff is further demanding punitive damages which exceed the $75,000. See Counts XIII–XVI.

2d Am. Compl. ¶ 1.

Considering the principle that the party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists, *Khadr*, 529 F.3d at 1115, Plaintiffs' allegations leave much to be desired. But the Court is directed to dismiss this matter only if it appears to a "legal certainty" that no Plaintiff can recover more than $75,000. *Rosenboro*, 994 F.2d at 17 (citing *St. Paul Mercury Indem. Co.*, 303 U.S. at 289). Although certain alleged damages are readily quantifiable, such as medical expenses and lost wages, other items are tied to emotional harms that are difficult to ascertain from initial pleadings. For instance, Lessie Cofield declares that she has suffered "irreparable harm because [she] will never have the opportunity to share the bond of sorority with [her] daughter as an Alpha Chapter undergraduate initiate because that moment is forever gone[]—never to be returned." Opp'n, Ex. 10 (Lessie

Cofield Aff.) [Dkt. 32-12] ¶ 28. She also refers to the "pain, suffering, and humiliation which resulted [from] [AKA's] broken promise and Howard University's interference with [her] contractual relationship with [her] sorority . . . ." *Id.* ¶ 29.

The alleged pain, suffering, and embarrassment that Plaintiffs experienced—particularly the Mothers—requires serious consideration. AKA is an organization steeped in rich historical traditions and dedicated to a compelling social purpose; since 1908, it has been premised on a shared duty to counteract the effects of discrimination and patriarchy on African American women. This is not just a flighty social club. Rather, AKA is a group of women united by a solemn purpose, and the opportunity to share in that legacy is undoubtedly valuable. Relatedly, the unjustified exclusion of an individual from this collective experience could impose emotional, social, and career impacts that transcend any sum certain. The emotional damage is all the more incalculable because of the value and pride that attaches—or, in the case of the Daughters, would have attached—to membership in AKA's flagship chapter. There are too many unquantifiable variables for the Court to declare it a legal certainty that no jury would award any Plaintiff more than $75,000. Accordingly, subject matter jurisdiction exists as to all claims alleging pain, suffering, and humiliation against AKA or Howard, namely, the Mothers' negligence claims against AKA and all claims of tortious interference against Howard.

### 2. Supplemental Jurisdiction

The remaining Counts relate to Plaintiffs' claims of breach of contract, ultra vires acts, and intentional infliction of emotional distress. For breach of contract, all Plaintiffs allege that AKA's Constitution and Bylaws created a contractual agreement between the organization and its members, and that AKA breached that agreement when it failed to accept the Daughters for the Membership Intake Process. The Mothers allege ultra vires acts and intentional infliction

of emotional distress based on AKA's withdrawal of membership privileges after Plaintiffs filed this lawsuit.

When a district court has original jurisdiction over a claim, it has "supplemental jurisdiction over all other claims that are so related to [those] claims . . . that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Claims are from the same "case or controversy" when they "'derive from a common nucleus of operative fact,'" such that the plaintiff would "'ordinarily be expected to try them all in one judicial proceeding.'" *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 580 (2005) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). If the supplemental claims arise from the same case or controversy, the court must then decide whether to exercise its discretion to assert jurisdiction over the remaining claims. In deciding whether to assert supplemental jurisdiction, courts are directed to consider whether judicial economy, convenience, and fairness to litigants weigh in favor of federal litigation. *Osborn v. Haley*, 549 U.S. 225, 245 (2007) (citing *Gibbs*, 383 U.S. at 726).

The factual allegations underlying the remaining claims either derive from the same Legacy Clause and recruitment process challenged in other Counts, or relate to actions taken by AKA in retaliation for raising those claims in federal court. To be sure, the Mothers allege ultra vires acts and intentional infliction of emotional distress based on conduct that occurred after the Membership Intake Process. Yet, these allegations are inextricably linked to the Sorority's rejection of Laurin Compton and Lauren Cofield, and therefore, all claims share a common nucleus of operative fact despite the time lapse between certain underlying events. In addition, judicial economy counsels in favor of considering these claims in the same lawsuit. Plaintiffs would be subject to a significant and unnecessary burden if they were required to

litigate the remaining claims in D.C. Superior Court.  *See Osborn*, 549 U.S. at 245.  Moreover, this Court is particularly well-suited to address the events that occurred after Plaintiffs filed this lawsuit, as these issues were the subject of extensive briefing and an Opinion issued by this Court in 2013.  *See Compton v. Alpha Kappa Alpha Sorority, Inc.*, 938 F. Supp. 2d 103 (D.D.C. 2013).  Accordingly, the Court will exercise supplemental jurisdiction over all remaining claims against AKA.

## B.  Failure to State a Claim

AKA and Howard also challenge the legal sufficiency of Plaintiffs' Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  AKA contends that (1) Plaintiffs cannot state a claim for breach of contract based on the plain terms of the Legacy Clause, (2) the ultra vires act claims are beyond the scope of claims allowed under the D.C. Code, (3) the negligence claims fail as a matter of law because AKA owed no duty to any Plaintiff, and (4) the intentional infliction of emotional distress claims should be dismissed because Plaintiffs cannot establish that the Sorority's conduct was extreme and outrageous. Howard contests Plaintiffs' claims of tortious interference with contractual relations because the University disputes that any breach occurred.  For the reasons set forth below, the Court will grant Howard's motion to dismiss and will grant AKA's motion to dismiss in part.

### 1.  Breach of Contract

Plaintiffs aver that AKA's Legacy Clause, which affords special treatment to the daughters of active or deceased sorors, creates a binding and enforceable contract between the Sorority and its members.  Plaintiffs claim that AKA breached its contract with the Mothers by refusing to accept the Daughters into the Membership Intake Process.  The Daughters allege that they were the intended third party beneficiaries of the Legacy Clause, and therefore, any breach

of that Clause is actionable by the Daughters. In response, AKA argues that "[a]ll that is required by the plain language of [the Legacy Clause] is that undergraduates who apply for membership . . . not be subjected to a vote." AKA Mot. to Dismiss at 6–7. Further, AKA argues that the Legacy Clause does not permit the Sorority to disregard Legacy caps imposed by universities or the NPHC.

Plaintiffs' breach of contract claims require (1) the existence of a valid contract, (2) an obligation or duty arising out of that contract, (3) a breach of the contract by AKA, and (4) damages suffered by Plaintiffs due to the breach. *See Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). A sorority's Constitution and Bylaws form a contract between that sorority and its members. *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 731 (D.C. 2011).

Plaintiffs primarily rely on AKA's Constitution and Bylaws, specifically, the Legacy Clause, to define AKA's contractual duty. The Legacy Clause provides:

> An undergraduate who is the daughter, granddaughter, adopted daughter, stepdaughter or legal ward of an active or deceased soror is considered a Legacy Candidate. This undergraduate may apply for membership under this provision . . . . Any undergraduate who applies for membership under the legacy provision must meet all of the qualifications required for undergraduate membership. She will not be subject to a vote by the chapter.

AKA Constitution & Bylaws, Art. IV, § 14.

Plaintiffs also note that AKA's Undergraduate Membership Intake Process Manual directs the Sorority to select candidates in the following order: (1) Legacies; (2) Sophomores; (3) Juniors; and (4) Seniors. 2d Am. Compl. ¶ 68 (quoting AKA Membership Intake Process Manual at I-15). As a result, before any other candidates were accepted, Plaintiffs argue, AKA was contractually obligated to accept the Daughters as Legacy Candidates.

But Plaintiffs fail to mention that AKA's Manual imposes other selection criteria when a university implements a Legacy Cap. In such circumstances, the AKA Manual provides that a chapter must select Legacy Candidates in the following priority order: (1) Sophomores, (2) Juniors, and (3) Seniors. AKA Membership Intake Process Manual at I-15. By imposing a selection order for Legacy Candidates, AKA implicitly acknowledges that some Legacy Candidates may not be selected for the Membership Intake Process when a Legacy Cap is in place. Moreover, the selection order demonstrates that when Legacy Candidates apply for membership intake at a university with a Legacy Cap, college seniors are the least likely to gain admission. That is precisely what happened here.

In 2013, AKA was constrained by both Howard University and NPHC Legacy Caps, the latter of which limited Legacy Candidates to one-third of a membership intake class. Plaintiffs allege that "before any non-Legacy members were accepted into the [Membership Intake Process] [,] all Legacy Candidates should have been accepted first because they were not subject to a chapter vote." 2d Am. Compl. ¶ 60. But AKA could accept only fifty new members in 2013, no more than one-third of whom could have been Legacy Candidates. As a result, AKA could admit no more than sixteen Legacy Candidates for the 2013 Membership Intake Process. AKA's Manual required it to select those sixteen candidates in the following order: (1) Sophomores, (2) Juniors, and (3) Seniors. Because *seventeen* Legacy applicants were sophomores and juniors, *see id.* ¶ 32, AKA was actually obligated to *reject* the Daughters based on the interacting provisions of its Manual, Constitution and Bylaws, and the NPHC regulations.

Plaintiffs seek to avoid this result by arguing that AKA was not required to adhere to NPHC's Legacy Cap. They cite AKA's Membership Intake Process Manual, which provides that "[i]f a *college* or *university* has a cap requirement," the chapter must rely on certain selection

criteria. Opp'n at 9 (emphasis in original). Because Howard University capped membership intake classes at sixty-five candidates, Plaintiffs aver that AKA erroneously limited its membership intake class to fifty candidates. However, this contention carries no weight. AKA's Constitution and Bylaws also require each chapter to adhere to Panhellenic Conference regulations. *See* AKA Constitution & Bylaws, Art. IV, § 22 ("The Membership Intake Process shall be conducted according to the process adopted by the Directorate except on college campuses where university *or Panehllenic Conference regulations* dictate other procedures." (emphasis added)). Plaintiffs cannot cherry-pick provisions of the Sorority's Constitution and Bylaws to compel a more favorable outcome. Instead, AKA's Constitution and Bylaws make clear that the Alpha Chapter followed the required process in selecting and rejecting candidates for the 2013 Membership Intake Process. The Court will dismiss the Mothers' breach of contract claims against AKA. Because the Daughters, as third party beneficiaries, have no greater rights under the Legacy Clause than those afforded to the Mothers, *see Trans Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976) (noting that third party beneficiaries "cannot accept the benefits and avoid the burdens or limitations of a contract"), the Daughters' allegations are also insufficient to state a claim for breach of contract. Accordingly, the Court will dismiss Counts One, Two, Four, and Five of the Second Amended Complaint.

### 2. Ultra Vires Acts

Sandra Compton and Lessie Cofield allege that AKA committed ultra vires acts when, on March 4, 2013, the Sorority withdrew the Mothers' membership privileges "in retaliation for filing the instant lawsuit and without constitutional or any other governing authority to do so." 2d Am. Compl. ¶¶ 74, 96. The Mothers claim to have "suffered harm by

having [their] rights as [] member[s] dishonored," and they contend that AKA stripped them of the "dignity, society, [and] honor conferred" by membership. *Id.* ¶¶ 75, 97.

An ultra vires claim can be asserted based on, *inter alia*, lack of corporate power to perform an act, limitations on the power of the corporation, or illegality. *See Daley*, 26 A.3d at 730 (citing 7A Fletcher Cyc. Corp. § 3399 (2006)). The D.C. Code provides that "[t]he power of a nonprofit corporation to act may be challenged in a proceeding by . . . [a] member, director, or member of a designated body against the corporation to enjoin the act." D.C. Code § 29-403.04(b)(1). An ultra vires claim can be brought against an organization "where the . . . action is 'expressly prohibited by statute or by-law,'" *Daley*, 26 A.3d at 730 (emphasis omitted) (quoting *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 7 (D.D.C. 1997)), or where the organization has exceeded the powers conferred upon it by its certificate of incorporation, bylaws, or statute, *id.*

AKA incorrectly asserts that the D.C. Code does not allow the Mothers to challenge the validity of the Sorority's actions. AKA Mot. to Dismiss at 8. The D.C. Code clearly gives "[a] member" the right to challenge the validity of a corporate action "on the ground that the nonprofit corporation . . . lacked the power to act." D.C. Code § 29-403.04; *see also Daley*, 26 A.2d at 730–31 (holding that members of AKA had standing to sue the Sorority for alleged ultra vires acts). Sandra Compton and Lessie Cofield are members of AKA and therefore have standing to sue the Sorority. It is true that the Mothers request compensatory damages, while the D.C. Code authorizes only injunctive relief. But the Mothers also request "such other and further relief deemed fair and just," 2d Am. Compl. ¶¶ 75, 97, and thus, Sandra Compton and Lessie Cofield's requested relief is broader than their express mention of damages. *See Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) ("In

deciding a 12(b)(6) motion, a court construes the complaint liberally in the plaintiff's favor . . . with the benefit of all reasonable inferences derived from the facts alleged." (internal citations and alterations omitted)). Accordingly, the D.C. Code does not bar the Mothers' ultra vires act claims.

Sandra Compton and Lessie Cofield allege that they have a protectable interest in the benefits and privileges of AKA membership and that the Sorority "failed to follow its Constitution [and] Bylaws as it relates to Withdrawal of Privileges." 2d Am. Compl. ¶¶ 72, 94.

AKA's Constitution and Bylaws provide:

SECTION 1. Each individual member and every chapter shall have knowledge of and shall fully comply, in good faith, with all provisions of the Constitution and Bylaws of Alpha Kappa Alpha Sorority, Incorporated. Penalties or sanctions shall be imposed when an individual member or chapter violates his/their obligations under the Constitution and Bylaws.

SECTION 2. The Regional Director shall have the authority to determine whether an individual member or chapter violation has occurred and to impose an appropriate penalty, subject to the approval of the Supreme Basileus . . . .

SECTION 3. The penalties for violation of the Constitution and Bylaws . . . may include: a) withdrawal of individual privileges . . . .

a) <u>Withdrawal of Individual or Chapter Privileges</u> shall be imposed for a period not to exceed twelve (12) months.

AKA Constitution & Bylaws, Article VI.

On March 4, 2013, AKA withdrew Lessie Cofield and Sandra Compton's membership privileges, stating that the Mothers' "initiative of this suit is in violation of the Constitution and Bylaws, and in particular, the Soror Code of Conduct . . . . Under Article VI of the Bylaws, this shall disqualify you from participation in the Sorority and all Sorority

activities . . . ." Pls. Ex. 2 (Lessie Cofield Letter) [Dkt. 14-1] at 1; *accord* Pls. Ex. 2 (Sandra Compton Letter) [Dkt. 14-1] at 1.

The Sorority's withdrawal letters to Sandra Compton and Lessie Cofield cite provisions that allow the Sorority to withdraw membership privileges for a Soror's violation of AKA's Constitution and Bylaws. However, the Sorority failed to cite any provisions that proscribe the underlying offense alleged here, namely, the filing of a federal lawsuit. In fact, AKA has recognized that its arbitration policy is not incorporated into the Constitution and Bylaws. In opposition to the Mothers' allegations of witness tampering, AKA attached its national arbitration policy—a supplemental document that it described as an "example[] of its attempt[] to avoid overuse of costly litigation." *See* AKA Mem. [Dkt. 16] at 1. AKA's arbitration policy constitutes a separate contract between the Sorority and its members, distinct from the Constitution and Bylaws. And nowhere in that separate agreement is the Sorority permitted to withdraw membership privileges based on a Soror's non-compliance. The record appears to suggest that AKA was not authorized to withdraw the Mothers' membership privileges under the Constitution and Bylaws because there is no provision either incorporating the arbitration agreement into the Constitution and Bylaws or prohibiting the filing of a federal lawsuit. Nor does it appear that AKA could withdraw membership privileges based on the arbitration agreement, as that document does not include the withdrawal of privileges as a remedy for a breach. The Mothers have adequately alleged ultra vires acts based on the Sorority's withdrawal of privileges in the absence of express constitutional authority. Therefore, the Court will not dismiss Counts Three and Six of Plaintiffs' Second Amended Complaint.

### 3. Negligence

Sandra Compton and Lessie Cofield further allege that AKA was negligent in its failure to "be well versed and knowledgeable of its own Constitution, Bylaws, Membership Intake Manuals, Howard University Handbook, and all other rules applicable to membership intake." 2d Am. Compl. ¶¶ 98, 104. Plaintiffs contend that AKA had a duty to know and apply these rules, and that it breached that duty when it "carelessly relied upon the illusory limitations of Howard University's Chapter of the [NPHC]," which, they allege, had no authority over the AKA Membership Intake Process. *Id.* ¶¶ 100, 106. To state a claim for negligence, the Mothers must allege that (1) AKA owed Plaintiffs a duty of care, (2) AKA breached that duty, and (3) Plaintiffs suffered damages proximately caused by AKA's breach. *See Powell By & Through Ricks v. District of Columbia*, 634 A.2d 403, 406 (D.C. 1993).

As stated above, however, the Mothers cannot establish that AKA breached any duty owed to Sandra Compton or Lessie Cofield by failing to accept the Daughters into its Membership Intake Process. In fact, it was AKA's *adherence* to its Constitution and Bylaws that required it to deny the Daughters entry into the Membership Intake Process. Because AKA did not breach any duty to the Mothers, they have failed to state a claim against AKA for negligence on this basis.

The Mothers also allege that AKA acted negligently by "improperly, imprudently, and unconstitutionally withdrawing [their] privileges as [] member[s] in retaliation for filing the instant suit seeking legal enforcement of [their] rights [as] guaranteed by AKA's Constitution." 2d Am. Compl. ¶ 101. The Court has found that the Mothers sufficiently alleged that AKA acted beyond its power and authority when it withdrew their membership privileges. However, "the District of Columbia does not recognize a cause of action in tort for negligent breach of

contractual duties . . . ."  *3307 M Street Partners v. Commonwealth Land Title Ins. Co.*, 782 F. Supp. 4, 6 (D.D.C. 1992).  Under D.C. Law, "a breach of contract may only give rise to a tort claim when there is an independent basis for the duty allegedly breached."  *KBI Transport Servs. v. Med. Transp. Mgmt., Inc.*, 679 F. Supp. 2d 104, 108–09 (D.D.C. 2010) (citing *Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1190 & n.3 (D.C. 1986); *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1200 (D.C. 1984)).  The Mothers allege that AKA negligently failed to comply with its Constitution and Bylaws, but they do not provide an independent basis for the Sorority's duty to comply with and properly enforce its governing documents.  Accordingly, the Court concludes that the Mothers have failed to state a claim for negligence based on the Sorority's withdrawal of membership privileges.  The Court will dismiss Counts Seven and Eight of the Second Amended Complaint.

### 4.  Tortious Interference with Contractual Relations

As against Howard, Plaintiffs claim that the University tortiously interfered with their contractual rights by limiting fraternities and sororities to sixty-five candidates during the 2013 Membership Intake Process.  While the stringent fifty-member limit was imposed by NPHC, Plaintiffs allege that Howard "intentionally and maliciously failed to . . . respond to AKA's concerns [about the fifty-member limit], knowing the lack of clarity would force AKA to breach its contract with Lessie Cofield[] and Sandra Compton, respectively . . . ."  2d Am. Compl. ¶¶ 115, 126, 137, 148.  Plaintiffs further contend that Howard University was responsible for the action of the Howard University Chapter of NPHC, which imposed a fifty-candidate cap as the agent and/or alter ego of the University.

Tortious interference with a contract requires (1) the existence of a contract between the plaintiff and a third party, (2) defendant's knowledge of that contract,

(3) defendant's intentional procurement of a breach, and (4) damages resulting from the breach. *Casco Marina Dev. LLC v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 83 (D.C. 2003) (citing *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C. 2000)). The Mothers and AKA had a valid and enforceable contract through the Sorority's Constitution and Bylaws, *see Daley*, 26 A.3d at 731, all Plaintiffs allege that Howard had knowledge of that contract, *see* 2d. Am. Compl. ¶¶ 109, 120, 131, 142 (alleging that Howard "knew or should have known that the [C]onstitution and [B]ylaws of AKA create[] a contractual relationship between AKA and its members") and all Plaintiffs allege that the Daughters' rejection from the Membership Intake Process resulted in damages.

However, Plaintiffs have failed to state a claim for tortious interference because Howard did not procure a breach. As set forth above, AKA did not breach its contract by failing to admit the Daughters into the Membership Intake Process. AKA's Constitution and Bylaws required the Alpha Chapter to follow University *and* Panhellenic Conference regulations for the Membership Intake Process. AKA Constitution & Bylaws, Art. IV, § 22. This constitutional provision is, therefore, just as much part of AKA's contractual obligations as its Legacy Clause. AKA adhered to NPHC regulations when it capped its 2013 membership intake class at fifty members.

Plaintiffs' theory that NPHC acted as the agent or alter ego of Howard University does not compel a different result. NPHC, not Howard, set the membership cap that limited AKA's ability to accept the Daughters' applications for the Membership Intake Process. Notably, Plaintiffs concede that Howard set a limit of sixty-five on the Membership Intake Process. *Id.* ¶ 111. Howard further disclosed that "*organizations* can select fewer and/or up to this number. The University does not dictate to *organizations* that they must have 65 new

members[,] [and therefore,] the claim that the University . . . is sending an unclear message . . . is unsupported." *Id.* (emphasis in original). As an NPHC member organization, AKA voluntarily bound itself to NPHC regulations, which, in this case, required it to limit its membership intake class to fifty members. *See* AKA Constitution & Bylaws, Art. IV, § 22. Accordingly, the Court will dismiss Counts Nine, Ten, Eleven, and Twelve, *i.e.*, the claims of tortious interference against Howard University.

### 5. Intentional Infliction of Emotional Distress

Finally, Sandra Compton and Lessie Cofield allege intentional infliction of emotional distress against AKA for its withdrawal of membership privileges, which, they allege, was intentionally calculated to retaliate against the Mothers for filing this lawsuit. 2d Am. Compl. ¶ 155 ("AKA retaliated against Plaintiffs Sandra Compton and Lessie Cofield to oppress them, tamper with and/or silence their testimony, and intimidate them, on account of their having sought legal redress to enforce their rights as active dues paying members of the sorority.").

To allege intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Williams v. District of Columbia*, 9 A.3d 484, 493–94 (D.C. 2010) (citation omitted). Specifically, a plaintiff must allege that the defendant's actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 494 (citation omitted). Certain actions can become outrageous by virtue of the defendant's "knowledge that the other [party] is peculiarly susceptible to emotional distress." *Drejza v. Vaccaro*, 650 A.2d 1308, 1313 (D.C. 1994) (citation omitted).

Plaintiffs have failed to plead facts showing that AKA's actions were extreme and outrageous. In the Second Amended Complaint, the Mothers allege that AKA's conduct was extreme and outrageous because the Sorority withdrew their membership privileges "while litigating a matter before [this Court] . . . to impede, impair, influence, tamper with, and/or intimidate [the Mothers] . . . ." 2d Am. Compl. ¶¶ 158, 166. In its prior opinion addressing potential AKA sanctions for witness tampering, this Court took note of the "wrongful, supercilious conduct of AKA" in withdrawing the Mothers' membership privileges. *Compton*, 938 F. Supp. 2d at 107. Despite that characterization, the Court found that "no sanction [was] appropriate" because "the effects of AKA's conduct would not have altered [the Court's] decision to deny [preliminary injunctive] relief." *Id.* Thus, this Court has indicated that while AKA's conduct was deplorable, it did not constitute conduct that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *See Williams*, 9 A.3d at 494 (internal citation omitted).

Plaintiffs also contend that AKA acted outrageously because Sandra Compton and Lessie Cofield were "peculiarly susceptible to emotional distress" insofar as they were faced with the "daunting task of testifying against their most cherished and beloved sorority." Opp'n at 20; *see also Drezja*, 650 A.2d at 1308–10 (recognizing a potential claim for intentional infliction of emotional distress where a defendant knew that the plaintiff was "in an especially vulnerable condition"). Assuming the truth of the allegation that Sandra Compton and Lessie Cofield were vulnerable because they valued and honored their ties to AKA and were distressed by the Sorority's actions, the Sorority's conduct cannot be described as "utterly intolerable in a civilized community." *See Williams*, 9 A.3d at 494 (internal citations omitted). Accordingly, the

Mothers' claims for intentional infliction of emotional distress, Counts Thirteen and Fourteen, will be dismissed.

## IV.  CONCLUSION

The Comptons and Cofields have endured disappointment and embarrassment because of the Daughters' rejection from AKA's Alpha Chapter and their subsequent filing of this lawsuit.  Nonetheless, the Court will grant AKA's Motion to Dismiss with respect to Plaintiffs' claims of breach of contract, negligence, and intentional infliction of emotional distress, and deny the motion with respect to the Mothers' ultra vires act claims.  The Court also will dismiss Plaintiffs' claims of tortious interference against Howard University.  A memorializing Order accompanies this Opinion.


Date: August 12, 2014                              _____/s/_____
                                                   ROSEMARY M. COLLYER
                                                   United States District Judge